MICHAEL L. LARSEN (4069)
MICHAEL W. YOUNG (12282)
PARSONS BEHLE & LATIMER
One Utah Center
201 South Main Street, Suite 1800
Salt Lake City, UT  84111
Telephone: (801) 532-1234
Facsimile: (801) 536-6111

*Attorneys for Kennecott Utah Copper LLC*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| KENNECOTT UTAH COPPER LLC, | Case No.  2:14-cv-00109 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| CCC GROUP, INC., | **JURY DEMANDED** |
| Defendant. | |

---

## COMPLAINT

Plaintiff Kennecott Utah Copper LLC ("Kennecott"), by and through counsel of record, and in support of this action for damages and other specified relief against Defendants CCC Group, Inc. ("CCC"), hereby alleges as follows:

### THE PARTIES

1.      Kennecott is a Utah limited liability company with its principal place of business located in Salt Lake County, Utah.

4827-8178-6391.6

2.     Upon information and belief, Defendant CCC is a Texas company organized and existing under the laws of Texas, with its principle place of business located at 5797 Dietrich Road, San Antonio, TX 78219.

## JURISDICTION AND VENUE

3.     The Court has subject matter jurisdiction over Kennecott's claims under 28 U.S.C. § 1332.

4.     This Court has personal jurisdiction over CCC because CCC entered a contract with Kennecott in which it agreed to subject itself to jurisdiction in the federal and state courts in Utah.  Moreover, CCC entered into a contract with a corporation based in Utah and performed a substantial amount of its contractual obligations and breaches within the state of Utah.

5.     Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to Kennecott's claims occurred within this judicial district.

## GENERAL ALLEGATIONS

6.     On or around July 11, 2011, Kennecott and CCC entered into an agreement ("Contract") wherein CCC agreed to provide labor, services, material, and equipment in connection with the Molybdenum Autoclave Processing ("MAP") project (the "Project").

7.     The work was to be performed on a "lump sum" basis for an original sum of $8,946,804.00.

8.     The Contract provided for adjustment in the lump sum price through the issuance of "change orders."  Change orders were intended to provide a means whereby work scope and price could be modified by the parties, thereby amending the Contract.

2

9.      The Contract allowed Kennecott to implement immediate changes to the scope and timing of the work through the issuance of "construction change directives."  If a construction change directive was issued, any changes in the work scope and/or price were to be reflected in a subsequent change order.

10.     Throughout the course of the Project, the Contract was amended through the change order process numerous times.

11.     On May 1, 2013, Kennecott issued Construction Change Directive L001.  This change directive reduced CCC's scope of work.

12.     Following the issuance of Change Directive L001, Change Orders 60 and 61 were issued.  Each of these change orders dealt with the close out of the Contract and detailed work to be done by CCC prior to demobilization from the site.

13.     Through party negotiations relative to Change Orders 60 and 61, the parties set the final Contract price at $61,355,608.05.  Payment of this price was contingent on the completion by CCC of several work or "punch list" items, including the completion of as-built drawings.

14.     Change Orders 60 and 61 specifically identified other unresolved disputes, including specifically the issue of CCC's defective painting and installation of steel floor gratings and stair treads.  The parties also agreed that all other contractual provisions would remain in full force, particularly those provisions related to warranties, rectification of defects, off-sets or deductions for defective or incomplete work, as well as the process for final completion.

4827-8178-6391.6

15. Change Order 61 was signed on or about August 6, 2013. A copy of Change Order 61 is attached as Exhibit A.

16. On or about August, 16, 2013, CCC demobilized from and abandoned the MAP Project site without completing the agreed-upon work outlined in Change Orders 60 and 61, and without resolving the outstanding paint/grating issues.

### *CCC's Failure to Paint Steel Grating*

17. As a structural steel and mechanical contractor for the MAP Project, CCC agreed to install steel grating of merchantable quality, fit for its intended use, and free from defects.

18. On May 13, 2011, CCC submitted its clarified bid in response to a Request for Proposals issued by Kennecott.

19. In submitting its bid proposal, CCC's Ron Ostler stated, "CCC Group, Inc. is pleased to respond to your request for tender for the referenced Project. Our proposal is submitted in accordance with your inquiry documents and is subject to the attached Proposal Clarifications."

20. Section 1 contains both commercial and technical clarifications. Under the headings "TECHNICAL CLARIFICATIONS-Structural" CCC stated:

21. "Re: Addendum 001, Response to Bidders [sic] Questions—In accordance with Q&A 1.64, we include only for structural steel, grating, decking, handrail etc. as detailed on the "S" series drawings. . . ." CCC's bid proposal also indicated that "Structural steel pricing includes for Paint System P1/P2. Should P10 be required in Area 3020 as noted on Drawing 3020-S-100, please add $329,600.00."

22.     In other words, CCC proposed to install steel grating using a P1/P2 Paint System for all areas with the possible exception of Area 3020.  Later, Change Order 2 noted that Area 3020 (like all other areas on site) would be painted using the P1/P2 Paint System as outlined in the job specifications.

23.     CCC was also required under the Contract and associated specifications to protect and cover the steel grating from the elements.

24.     CCC's bid proposal outlining the use of the P1/P2 Paint System mirrored the requirements outlined in the paint specifications for the scope of work.  Specifically, Specification 3000-GC-P-012 § 8.0 noted that steel grating was to be painted "standard black" using specific paint, Ameron No. BK-1 and Carboline No. C900.

25.     On or about October 19, 2011, CCC issued request for information (RFI) 103, seeking clarification or exemption from applying the P1/P2 Paint System.

26.     RFI 103 specifically referenced Specification 3000-GC-P-012 § 8.0, and proposed using an alternative paint system to the P1/P2 Paint System.

27.     Kennecott's representative expressly rejected CCC's request to use an alternative paint system, noting the applicable "spec calls for epoxy paint, not asphalt."

28.     Roughly one week later, CCC again requested that it be relieved from the contractual requirement to use the P1/P2 Paint System.  In that letter CCC identified the P1/P2 Paint System as "the current [] specification," but again asked Kennecott to accept a "modification to the project specification" relieving it from that obligation.

29.     Kennecott's company representative did not respond to this letter request and accordingly, it was rejected by default as outlined by the Contract.

5

30.　　CCC did not paint the steel grating—using any paint system—prior to installation.

31.　　CCC did not properly cover and protect the steel grating from the weather, exposing the grating to rain, snow, and other corrosive elements.

32.　　On or about July 11, 2013, a Construction Non-Conformance Report ("NCR") was issued by Kennecott to CCC indicating that the grating installed by CCC did not meet Contract requirements and specifications and was, therefore, rusting and corroded.

33.　　Having failed to remedy the defective grating, Kennecott issued CCC a formal letter, dated August 12, 2013, asking that CCC begin to remedy the defective grating within ten days.

34.　　Ultimately, CCC refused to repair the defective grating and, instead, demobilized and abandoned the job site.

### *CCC's Failure to Provide Kennecott with As-Built Drawings*

35.　　The Contract required CCC to "maintain at the Site one set of drawings marked in red ink showing as-built locations and details of all items of the work installed under this Contract at variance with the information as indicated on the Contract Documents (*As-Built Drawings*)."

36.　　CCC understood that Kennecott expected to receive a set of as-built drawings upon completion of CCC's work on the Project.  Indeed, CCC identified its Project Engineer, Garrett Catten, as one of its "Key Personnel" and among his duties, or the duties of the position, noted that Mr. Catten would prepare "change orders and 'as built' drawings, as required."   In its bid, CCC also promised to "[m]aintain a current record set of all contract drawings at the job site office at all times.  Maintain additional sets of drawings, as required, for field, home office, as-

6

built drawings, marking-up, and otherwise [sic] necessary." (Emphasis added). CCC failed to provide the services included in its bid and required by the Contract. It neither maintained nor delivered "as-built" drawings to Kennecott.

37.    To this end, the Contract conditioned final payment on the completion and submittal of as-built drawings.

38.    During the Project Kennecott never released CCC of its contractual obligation to maintain and present as-built drawings. Notably, during a pre-bid meeting held on April 4, 2011, Kennecott notified CCC that red line drawings were to be turned over as part of the package.

39.    Kennecott formally requested a copy of all the as-built drawings in Change Directive L001.

40.    On or about July 31, 2013, CCC submitted drawings to Kennecott labeling such "as-built" drawings.

41.    These drawings were not as-built drawings as defined and required by the Contract. Accordingly, CCC agreed to revise and resubmit as-built drawings to Kennecott.

42.    CCC submitted a second set of drawings to Kennecott. Again, these drawing did not conform to the requirements of the Contract. Specifically, this set of drawings did not contain a representation of the state of CCC's work. For example, many of the supposed as-built drawings merely attached RFIs or Change Orders to the back of the drawing rather than a detailed depiction of what was actually built.

43.    On August 13, 2013, Kennecott informed CCC that the drawings provided to Kennecott "did not meet the definition of As-Built drawing per the Contract, [were] not of merchantable quality and [were] not fit for their intended purpose."

44.    CCC has refused to revise their as-built submittals.

***CCC's Failure to Complete Punch-List Items, NCRs, and Other Defective Work***

45.    As noted above, Kennecott issued a Construction Change Directive to CCC on May 1, 2013.

46.    The change directive, Change Directive L001, instructed CCC to cease all work under the Contract with the exception of several categories of work for which CCC was expected to proceed.  Among the tasks to be completed by CCC under the change directive was the completion of noted NCRs and punch-list items.

47.    The Contract required CCC to proceed with its work on the Project as delineated in the change directive.

48.    CCC did not formally notify Kennecott of any disagreement it had with the Change Directive L001.

49.    The change directive expressly noted that "[a]ny changes to the Work creating additions or deductions in costs . . . will be negotiated and applied to the next Change Order."

50.    Specifically, Change Order 60 noted that an audit was to be performed to determine the cost deductions to the "Contract Price for all non-completed Work and non-completed FWOs pursuant to Change Directive L001."

51.    Change Order 60 also explained that "Change Order #61 [would] be the final Change Order prior to Contract Close out, and [would] add the value of any remaining approved FWOs and deduct the value of all non-completed Work and non-completed FWOs discovered in the audit."

52.    Change Order 60 provided for an upward adjustment in the Contract price based on the list of attached FWOs.  The total value for Change Order 60 was $1,405,162.95, bringing the then-total lump sum Contract price to $62, 992,271.41.

53.    Two months after the approval of Change Order 60, the parties signed Change Order 61.  Change Order 61 provided for a downward adjustment in the contact price of $1,636,663.31.  This reduction in price was the product of (1) upward adjustment in the Contract price based on additional tasks agreed to be completed by CCC less (2) deductions in the Contract price based on credits due to Kennecott for Work not performed or completed as directed under Change Directive L001.  This reduction resulted in a lump sum Contract price of $61,355,608.05.

54.    Of critical importance is the following language included in Change Order 61:

> Subject to the terms of this Agreement and the Contract (including, without limitation, General Condition Section 6.2, 7.2, 14.1, 25.1 and 25.2), the total amount payable to CCC under the Contract is Sixty One Million, Three Hundred and Fifty Five Thousand, Six Hundred and Eight Dollars and Five Cents ($61,355,608.05) ("Total Contract Price").  The Total Contract Price shall be subject to verification by the Company prior to final payment that all Work (including without limitation, all "punch-list" items) has been completely and satisfactorily performed in accordance with the Contract Documents, with the exception of non-completed Work and non-completed FWOs described in this Change Order.  The major quality issues, including the painting and grating referenced in the Notice of Dispute issued on July 2, 2013 shall be separately addressed pursuant to the Contract.

55.    The initiation of Change Directive L001, followed by the issuance of Change Orders 60 and 61, signaled an effort by the parties to wind down the work for which CCC was contracted.  This process was a collaborative effort by both parties to identify the NCR and punch-list items that needed to be completed prior to CCC leaving the job site.

56.    The parties agreed that CCC would (1) complete the established NCR and punch-list items, and (2) remedy any deficiencies in CCC's work discovered in the immediate future.

57.    To date, CCC has failed to complete the identified NCR and punch list items.

58.    CCC has also refused to complete or remedy any defective work not part of the initial efforts of the parties to wind the Project down and since identified by Kennecott.

59.    CCC was obligated to perform and absorb the cost of the re-work required to remedy the grating/painting issue.

### _The Mediation and Settlement Agreement_

60.    Parallel with the efforts to implement Change Orders 60 and 61, Kennecott formally put CCC on notice that Kennecott disputed specific invoices and that Kennecott did not intend to pay CCC any further given CCC's performance on the job.

61.    Specifically, on June 17, 2013, Kennecott sent CCC a letter requesting CCC executives attend a contract "close-out" meeting on July 3, 2013, wherein final payment and contract costs would be resolved and agreed upon.

62.    The parties failed to reach an agreement regarding final contract price and payment at the July 3, 2013 meeting.  Accordingly, on July 12, 2013, Kennecott sent a letter to CCC initiating dispute resolution procedures.

63.    On August 20, 2013, CCC issued Invoice BSL 1492-23 (the "Final Invoice") requesting payment of $4,938,914.01.    The Final Invoice is further identified as P.O. 3100626781, a copy of which is attached hereto as Exhibit B.

64.    Kennecott refused to pay this invoice on the basis that the work referenced in Change Order 61 had not been completed and the parties agreed to mediate their dispute.

65.    Fundamental to the dispute between the parties was the outstanding balance claimed by CCC to be due under its Final Invoice.

66.    Specifically, Change Order 61 set the contract price for CCC's work at $61,355,608.05.    The total amount paid to CCC according to its Final Invoice was $56,416,694.04, leaving a remaining balance of $4,938,914.01 allegedly owed to CCC. Accordingly, the Final Invoice submitted to Kennecott by CCC listed this precise amount as the unpaid balance.

67.    The dispute between the parties consisted of CCC's claim that it was owed $4,938,914.01, plus interest, and Kennecott's claim that such amounts were not due because of CCC's contract breaches and failure to complete the punch list and NCRs.

68.    Mediation of the dispute resulted in a settlement agreement being signed on December 17, 2013 ("Settlement Agreement"), whereby Kennecott agreed to pay CCC $2 million of the amount in dispute in exchange for mutual releases.

69.    After the parties entered in to the Settlement Agreement, and as Kennecott was preparing to timely make the $2 million payment, Kennecott discovered it had already paid CCC $2,140,034.61 more than the amount CCC represented it had been paid in its Final Invoice.

70.    Kennecott immediately brought this overpayment to CCC's attention, asserting that obviously the parties had been mutually mistaken concerning the amount that had already been paid to CCC going into the mediation.

71.    CCC admitted through counsel that it learned of the overpayment during the mediation but elected not to disclose it either to the mediator or to Kennecott.    The mediation proceeded to a settlement based on that misinformation.

4827-8178-6391.6

72.    Kennecott acted reasonably going into the mediation by verifying the amount it believed had been paid to CCC, which belief was confirmed by the representations of CCC and its counsel concerning the amount of the Final Invoice.

73.    Specifically, on June 6, 2013, multiple payment requests were entered in to the automated management system used by Kennecott to, among other things, facilitate payment to its vendors, including payment of invoices from CCC.

74.    On June 17, 2013, the majority of these payment requests from CCC were reversed in the Systems, Applications, and Products ("SAP") Software.  That is, Kennecott intended to withhold payment of these requests as the parties were in the midst of negotiations regarding the contract close-out and the amount due to CCC.

75.    On June 18, 2013, Kennecott issued credit memoranda noting that $2,140,034.61 of the June 6, 2103 payment requests should not be paid.

76.    However, the credit memoranda issued on June 18, 2013, did not prevent the payment of the $2,140,034.61 because the memoranda was associated with the P.O number of the Final Invoice (P.O. 3100626781) and therefore, did not migrate to the accounts payable and scheduled payments reports.

77.    Notably, the accounts payable and scheduled payment reports do not track or reference purchase orders, causing a disconnect between the SAP Software that tracks amounts paid vis-à-vis purchase orders/invoices.

78.    Accordingly, $2,140,034.61 was unwittingly wired to CCC on July 17, 2013 despite formal notice from Kennecott on July 12, 2013, that these monies were in dispute and payment of these monies, if any, would be resolved through formal dispute resolution

4827-8178-6391.6

procedures.  Kennecott did not learn of this situation until early January 2014 as it was preparing to pay the $2 million settlement amount to CCC.

79.     This oversight was not unique to Kennecott.  Despite CCC having received the unintended payment on July 17, 2013, CCC issued its Final Invoice on August 20, 2013 and did not reflect receipt of the $2,140,034.61 payment.

80.     As noted above, the Final Invoice was based exclusively on CCC's claim for monies due and owing under the contract price listed in Change Order 61, less any and all payments received by CCC to date.

81.     In fact, the Final Invoice expressly states the contract price as $61,355,608.05, the amount paid to date as $56,416,694.04, and the outstanding balance owed as $4,938,914.01.

82.     To date, CCC has actually been paid $58,556,728.65 by Kennecott.

83.     At no time has CCC ever claimed or demanded payment of $2,798,879.40 (the difference between the contract price of $61,355,608.05 and $58,556,728.65).

84.     Despite the fact that the Settlement Agreement was intended to resolve all disputes between the parties, CCC has indicated that it believes it is owed an additional $2 million from Kennecott notwithstanding the unaccounted for payment of $2,140,034.61.

85.     Upon information and belief, CCC intends to seek payment of an additional $2 million on the basis that such was agreed to by Kennecott in the Settlement Agreement.

## FIRST CAUSE OF ACTION
### Declaratory Judgment – Satisfaction of Settlement Agreement and Reimbursement for Overpayment

86.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

13

87.    The central issue of dispute between Kennecott and CCC was the amount of money owed, if any, by Kennecott to CCC.

88.    The parties agreed and understood that the unpaid balance under CCC's Final Invoice to Kennecott was $4,938,914.01.

89.    The unpaid balance of $4,938,914.01 was a material fact upon which both parties relied.

90.    The Settlement Agreement contained the following clause:

> Each of the Parties acknowledges that it may hereafter discover facts different from, or in addition to, those which it now knows or believes to be true with respect to the Released Claims, and hereby agrees that this release shall be and remain effective in all respects notwithstanding such different or additional facts or discovery thereof.

91.    Accordingly, despite the fact that both parties were unaware that Kennecott had already paid CCC monies sufficient to satisfy its obligation under the Settlement Agreement, Kennecott's payment to CCC of $2,140,034.61 on July 17, 2013 more than satisfies its obligation under the Settlement Agreement.

92.    As of the commencement of the mediation on December 17, 2013, both parties mistakenly believed that the total amount paid to CCC by Kennecott under the Contract was only $56,416,694.04 and that the unpaid balance of the Final Invoice was $4,938,914.01.

93.    Without the context of the material fact and presumption that the Settlement Agreement sought to resolve CCC's claim for $4,938,914.01 allegedly due under the Contract, the Settlement Agreement fails to conform to the parties' intentions, and should be reformed to reflect such intentions.

94.     CCC learned during the mediation and prior to the execution of the Settlement Agreement that Kennecott had paid CCC $2,140,034.61 toward the Final Invoice without getting credit for it by CCC but then remained silent about those material facts.  CCC's knowledge of those facts, and Kennecott's lack of knowledge thereof, constitutes a unilateral mistake regarding the amount unpaid and in dispute.  Because of that unilateral mistake, and CCC's perpetuation of that misunderstanding, the Settlement Agreement is not based on a mutual understanding or meeting of the minds by the parties.

95.     CCC knew at the time the Settlement Agreement was signed that Kennecott had paid CCC $2,140,034.61 toward the Final Invoice but concealed that information from Kennecott.

96.     Kennecott agreed to terms of the Settlement Agreement based on representations that CCC knew where false or inaccurate.  The Settlement Agreement should be reformed based on CCC's fraudulent acts and omissions.  Indeed, all demands for payment from CCC were for payment of the Final Invoice amount, not for payment of $2,798,879.40 (the difference between the contract price of $61,355,608.05 and $58,556,728.65).

97.     Therefore, the Settlement Agreement should be reformed to expressly incorporate the fact that payment by Kennecott of $2 million satisfied CCC's claim of $4,938,914.01 and released Kennecott of all related liability.   In other words, Kennecott was only required to pay CCC $2 million above the $56,416,694.04 shown as already paid in the Final Invoice.  Kennecott has in fact paid CCC $104,034.61 more than required under the terms of the Settlement Agreement.

98.    There is no available remedy at law to protect the interests of Kennecott with respect to the enforceability of the Settlement Agreement.

99.    Kennecott is entitled to a refund of the $104,034.61 paid in excess of the agreed-upon $2 million set out in the Settlement Agreement.

### SECOND CAUSE OF ACTION
**Breach of the Duty of Good Faith and Fair Dealing – The Settlement Agreement**

100.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

101.    The Settlement Agreement imposed on CCC an inherent and implied duty of good faith and fair dealing.

102.    CCC was aware that Kennecott had already paid CCC $2,140,034.61 toward the amount in dispute between the parties and listed in the Final Invoice at the time the Settlement Agreement was signed.

103.    CCC knew that Kennecott was not aware of its payment of $2,140,034.61 to CCC toward the amount in dispute between the parties and listed in the Final Invoice at the time the Settlement Agreement was signed.

104.    CCC failed to disclose the $2,140,034.61 payment at the time the settlement agreement was signed.

105.    After the Settlement Agreement was signed, Kennecott discovered that it had already paid $2,140,034.61 to CCC toward the amount in dispute between the parties and listed in the Final Invoice.

106.    CCC refused to accept in good faith the payment $2,140,034.61 as satisfaction of the Settlement Agreement.

16

107. As a direct and proximate result of CCC's breach of the covenant of good faith and fair dealing inherent in the Settlement Agreement, Kennecott has sustained injury and damage. Therefore, the Settlement Agreement should be reformed to reflect Kennecott's full payment of the settlement amount. Kennecott is further entitled to reimbursement in an amount equal to the overpayment $104,034.61 paid in excess of the agreed-upon $2 million set out in the Settlement Agreement.

**As an alternative to the foregoing cause of action, Kennecott seeks compensation and damages from the following causes of action:**

<u>**THIRD CAUSE OF ACTION**</u>
**Declaratory Judgment – Rescission of Settlement Agreement**
**(Mutual Mistake)**

108. Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

109. The Settlement Agreement is unenforceable because both parties were mistaken about the amount in controversy between the parties.

110. Specifically, both parties agreed to the terms of the Settlement Agreement with the understanding that the outstanding amount allegedly owed by Kennecott to CCC under the Contract and the Final Invoice was $4,938,914.01.

111. In negotiating and developing the Settlement Agreement, both parties intended to resolve a dispute regarding the allegedly unpaid amount of $4,938,914.01 based on the Final Invoice.

112.     However, at the time the settlement amount was being negotiated by the parties, both parties were mutually mistaken about the total monies already paid to CCC by Kennecott under the Contract.

113.     The outstanding balance in dispute was material to the agreement because it formed the fundamental basis for the settlement amount agreed upon by the parties.

114.     The additional $2 million wrongfully sought by CCC has not been paid. Accordingly, CCC is in the same position today as it was prior to when it entered in to the Settlement Agreement.

115.     There is no available remedy at law to protect the interests of Kennecott with respect to the enforceability of the Settlement Agreement.

116.     Therefore, the Settlement Agreement should be set aside with each party returning to its respective position prior the parties signing the Settlement Agreement.

### FOURTH CAUSE OF ACTION
**Declaratory Judgment – Rescission of Settlement Agreement**
**(Unilateral Mistake)**

117.     Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

118.     Kennecott was mistaken at the time the Settlement Agreement was signed about the outstanding amount allegedly owed by Kennecott to CCC.

119.     CCC learned during the mediation leading to the Settlement Agreement that Kennecott had already paid CCC $2,140,034.61 toward the Final Invoice and CCC remained silent about this fact. Thus, the Settlement Agreement should be rescinded based on Kennecott's

unilateral mistake regarding said payment because the Settlement Agreement fails to conform to a mutual understanding or meeting of the minds by the parties.

120.    To force Kennecott to pay CCC an additional $2 million above the $58,556,728.65 it has already paid would be unconscionable because such is essentially twice the amount Kennecott believed it had agreed to pay in entering the Settlement Agreement.

121.    Indeed, Kennecott entered in to the Settlement Agreement with the understanding that the amount in controversy sought by CCC under the Contract was $4,938,914.01.

122.    The amount in controversy relative to CCC's contract claims was a fundamental and significant feature of the Settlement Agreement.

123.    At the time Kennecott entered in to the Settlement Agreement, Kennecott had made a reasonable effort to ascertain the precise amounts paid to CCC prior to the parties entering settlement negotiations.

124.    Additionally, all demands for payment from CCC were for payment of the Final Invoice, not for payment of $2,798,879.40 (the difference between the contract price of $61,355,608.05 and $58,556,728.65).

125.    The additional $2 million wrongfully sought by CCC has not been paid. Accordingly, CCC is in the same position today as it was prior to when it entered in to the Settlement Agreement.

126.    There is no available remedy at law to protect the interests of Kennecott with respect to the enforceability of the Settlement Agreement.

127.    Therefore, the Settlement Agreement should be set aside with each party returning to its respective position prior the parties signing the Settlement Agreement.

## FIFTH CAUSE OF ACTION
### Declaratory Judgment – Rescission of Settlement Agreement
### (Fraud)

128.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

129.    CCC submitted its Final Invoice to Kennecott understating the amount it had been paid by $2,140,034.61.

130.    CCC continued to misrepresent the amount it had been paid by Kennecott up to and throughout the mediation and settlement process.

131.    CCC and its counsel had a duty to disclose the receipt of the $2,140,034.61 in light of its continued affirmative assertions that CCC had only ever been paid $56,416,694.04 rather than the $58,556,728.65 actually, but mistakenly, paid by Kennecott.

132.    Whether by its material misrepresentation of the amount CCC claimed was unpaid, or by virtue of its omitting to inform Kennecott of this very material fact once CCC unilaterally learned of the payment, CCC intended to cause Kennecott to rely on the misinformation to CCC's advantage and benefit during the mediation process.

133.    CCC knew at the time the Settlement Agreement was signed that Kennecott had paid CCC $2,140,034.61 toward the Final Invoice but took affirmative steps to conceal this fact or induce Kennecott into signing the Settlement Agreement through representations and omission that CCC knew where false, devious, inaccurate and misleading.

134.    The Settlement Agreement should be rescinded based on CCC's fraudulent acts. Specifically, all demands for payment from CCC were for payment of the Final Invoice amount,

not for payment of $2,798,879.40 (the difference between the contract price of $61,355,608.05 and $58,556,728.65).

135.    CCC knew that Kennecott would not agree to pay CCC $4,140,034.61 (the sum of the $2,140,034.61 unwittingly paid by Kennecott to CCC on July 17, 2013 plus the $2 million Kennecott agreed to pay in settlement of the Final Invoice) to satisfy and release Kennecott from CCC's claim for $4,938,914.01.

136.    CCC, through affirmative statements, acts, and omissions sought to avoid alerting Kennecott to the fact of the unaccounted for payment of $2,140,034.61.

137.    CCC's decision to perpetuate and take advantage of Kennecott's mistaken understanding regarding monies paid to CCC was made deliberately and with scienter.

138.    CCC's actions were intended to induce Kennecott into entering the Settlement Agreement, thereby availing itself of monies in excess of $2 million that it knew Kennecott would not otherwise agree to pay.

139.    CCC knew that Kennecott was relying on CCC's claims and statements regarding the outstanding balance reflected in the Final Invoice.

140.    Kennecott reasonably relied CCC's statements, acts, and omissions regarding the outstanding balance reflected in the Final Invoice.  Kennecott took steps on its own to ascertain the amount in dispute which were confirmed by CCC's Final Invoice and its misrepresentations during the mediation.

141.    The additional $2 million wrongfully sought by CCC has not been paid. Accordingly, CCC is in the same position today as it was prior to when it entered in to the Settlement Agreement.

142.    There is no available remedy at law to protect the interests of Kennecott with respect to the enforceability of the Settlement Agreement.

143.    Therefore, the Settlement Agreement should be set aside with each party returning to its respective position prior the parties signing the Settlement Agreement.

## SIXTH CAUSE OF ACTION
### Breach of Contract

144.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

145.    The parties entered into a valid and binding agreement, whereby CCC promised to provide certain construction services in exchange for payment.

146.    Kennecott has paid CCC, to date, in excess of $58 million for services.

147.    CCC has breached the Contract by, among other things,:

a.    Failing to implement steel grating painted and coated in conformance with contractual requirements;

b.    Failing to protect and cover steel grating from exposure to weather such as rain, snow, and other corrosive elements;

c.    Installing corroded steel gratings that are not of merchantable quality, fit for their intended use;

d.    Installing steel gratings that present a safety hazard as they are not installed according to design specifications;

e.    Failing to provide as-built drawings as required and outlined in the Contract;

f.    Failing to remedy or complete agreed-upon punch-list and NCR items; and

g.  Failing to remedy or complete defective work subsequently discovered by Kennecott after CCC demobilized from the job site.

148.    All of the defective and incomplete work highlighted above is within the agreed-upon scope of work defined by the parties and, therefore, gives rise to material breaches of the Contract.

149.    As a direct and proximate result of CCC's breaches of the Contract, Kennecott has sustained injury and damage in an amount to be proven at trial.  Kennecott alleges that this amount exceeds $6 million.

## SEVENTH CAUSE OF ACTION
### Breach of the Duty of Good Faith and Fair Dealing – The Contract

150.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

151.    The Contract imposed on CCC an inherent and implied duty of good faith and fair dealing.

152.    CCC has received monies and payments in excess of the work and services it provided under the Contract.

153.    By choosing to abandon the job site instead finishing the work it agreed to complete under the Contract, CCC has prevented Kennecott from realizing the benefits of the Contract.

154.    CCC also engaged in conduct during its performance of the Contract that has restricted Kennecott's appreciation of the benefits of the agreement between the parties.  In particular, CCC failed to meaningfully engage in a winding down process wherein deficiencies and defects in CCC's work would have been identified and more efficiently remedied.

23

155.    CCC precluded Kennecott from fully benefitting from the Contract by signing Change Orders 60 and 61 and then almost immediately demobilizing from the job site without performing.

156.    CCC knew at the time it was involved in the mediation with Kennecott that it had understated the total amount of payments received from Kennecott under the Contract.  CCC had an obligation under the Contract to act in good faith to disclose the misinformation it had supplied in its Final Invoice and in representations to Kennecott and the mediator.  Failing to do so violated the duty of good faith and fair dealing implied in the Contract requiring reformation or rescission of the Settlement Agreement and damages as determined at trial.

157.    As a direct and proximate result of CCC's breach of the covenant of good faith and fair dealing inherent in the Contract, Kennecott has sustained injury and damage in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### Negligent Misrepresentation – The Contract

158.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

159.    CCC made negligent material misrepresentations or omissions to Kennecott prior to, during, and after entering into the Contract.

160.    CCC represented to Kennecott that it would apply certain labor rates, unit prices, and other pricing mechanisms when invoicing for work performed under the Contract.  These representations were made when CCC provided its bid proposal as well as during it performance of work.  CCC did not, however, apply the agreed-upon and promised labor rates, unit prices and

other pricing mechanisms when invoicing Kennecott for work allegedly performed at the job site whether such invoicing was the product of time and material pricing or lump sum pricing.

161.   CCC represented to Kennecott that it would perform certain duties to secure its work in a safe manner prior to leaving the job site but did not do so.

162.   CCC represented to Kennecott that it would perform other work duties prior to leaving the job site in exchange for an increase in the amount paid to CCC in Change Orders 60 and 61.  In particular CCC promised to engage in a process of identifying punch-list and NCR items, remedy those items and warranty that work.  CCC did not perform these duties.

163.   CCC made other representations and promises to Kennecott of a material nature regarding its ability to perform and intent to do so.

164.   CCC's representations were false and/or negligent when made, as CCC did not intend to follow through on those representations.

165.   CCC had a pecuniary interest in securing cooperation and additional payments from Kennecott above the Contract price.

166.   CCC was in the superior, if not the sole, position to know the facts surrounding the representations made to Kennecott.

167.   CCC knew, or should have reasonably foreseen, that Kennecott would rely on CCC's material representations and assurances to Kennecott's detriment.

168.   CCC's material misrepresentations have directly and proximately caused damages to Kennecott in an amount to be determined at trial, including but not limited to all damages and losses caused by the misrepresentations.

## NINTH CAUSE OF ACTION
### Declaratory Judgment – Applicability of Warranty Rights

169.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

170.    The Contract provides Kennecott with an eighteen-month warranty period over work performed by CCC following the issuance of the Substantial Completion Certificate, with an additional twelve month period extending from when defects are corrected.

171.    Kennecott has not issued a certificate of Substantial Completion to CCC.

172.    Accordingly, neither the eighteen month warranty period, nor the twelve-month extension for defective work have commenced.

173.    Therefore, any additional defects discovered in the work performed by CCC that have not already been identified fall under these warranty provisions, entitling Kennecott to full compensation for any necessary remediation.

174.    CCC has refused to recognize Kennecott's warranty rights, refusing to remedy incomplete and/or defective work, presenting a justiciable controversy between the parties regarding the validity of Kennecott's warranty rights.

175.    CCC has claimed that it has fulfilled all its obligations under the Contract, and that its performance is complete requiring no additional work.  Accordingly, without judicial determination of the warranty rights available to Kennecott under the Contract, the status between the parties with regard to the warranty rights covering and affecting the rights will remain uncertain.

176.    The disagreement between the parties regarding the underlying dispute and, in particular, the applicability of Kennecott's warranty rights under the Contract are in an advanced

4827-8178-6391.6

stage, yet remain unresolved.  Judicial intervention in this matter is necessary to resolve the interpretive dispute between the parties.

## TENTH CAUSE OF ACTION
### Accounting and Audit

177.    Plaintiff incorporates herein by reference the allegations contained in the above paragraphs.

178.    Although the parties entered in to a lump sum agreement, significant portions of work were awarded to CCC on a Time and Materials basis.

179.    Additionally, the Contract provides Kennecott the right to audit the work executed by CCC.

180.    Regardless of whether or not work was performed on a time and material basis or lump sum basis, certain costs associated with the Contract price were established by the Contract documents, i.e. labor rates and unit pricing.

181.    By virtue of the relationship between the parties, Kennecott was reliant on CCC to maintain and preserve certain information that the parties agreed would be subject to an audit by Kennecott.

182.    Accordingly, in order to determine the full scope of corrective action required by CCC under the Contract and/or the full sum of damages suffered by Kennecott in this matter an audit of the work performed by CCC must be conducted.

4827-8178-6391.6

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief for its First and Second Causes of Action as follows:

1.      For an order and judgment declaring Kennecott has paid CCC in full for its work on the Map Project, reforming the Settlement Agreement to so reflect, and otherwise enforcing the reformed terms of the Settlement Agreement;

2.      For a judgment against CCC for reimbursement and payment of $104,034.61 in accordance with the Settlement Agreement;

3.      For pre-judgment interest and post-judgment interest; and

4.      For such other, further, and/or different relief as the Court may deem just and proper.

ALTERNATIVELY, Plaintiff prays for relief for its Third through Tenth Causes of Action as follows:

1.      For an order and judgment declaring the Settlement Agreement unenforceable;

2.      For economic and consequential damages in an amount to be proven at trial but that exceed $6 million;

3.      For pre-judgment interest and post-judgment interest;

4.      For costs of suit herein incurred and attorneys' fees to the extent recoverable by law; and

5.      For an order requiring that CCC provide Kennecott a full inspection and accounting of work allegedly performed by CCC for Kennecott under the Contract, and an order

declaring that Kennecott has performed in accordance with the Contract and is not obligated to pay CCC anything further under the Contract;

6.      For an order and judgment declaring that the warranty obligations under the Contract survive according to the terms of the Contract; and

7.      For such other, further, and/or different relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of any issue so triable.

/s/ Michael W. Young
MICHAEL L. LARSEN
MICHAEL W. YOUNG
PARSONS BEHLE & LATIMER
*Attorneys for Kennecott Utah Copper LLC*

4827-8178-6391.6